In the
United States Court of Appeals
for the Fifth Circuit

---

No. 25-30438

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

MAURICE MITCHELL,

*Defendant - Appellant*

---

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 3:24-CR-164-1

---

## ORIGINAL BRIEF FOR THE APPELLANT
## MAURICE MITCHELL

---

**CRISTIE GAUTREAUX GIBBENS**
Interim Federal Public Defender

**DUSTIN C. TALBOT**
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of
Louisiana
102 Versailles Blvd., Ste. 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

*Attorney for the Appellant*

In the
United States Court of Appeals
for the Fifth Circuit

No.  25-30438

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

MAURICE MITCHELL,

*Defendant - Appellant*

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 3:24-CR-164-1

## ORIGINAL BRIEF FOR THE APPELLANT
## MAURICE MITCHELL

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

i

**Judges Below:**

> The Honorable Terry A. Doughty, United States District Judge
> The Honorable Kayla D. McClusky, United States Magistrate
>    Judge

**Defendant - Appellant:**

> Maurice Mitchell
> B.O.P. Reg. No. 30307-511

**Attorneys for the Defendant - Appellant:**

> Dustin C. Talbot (on appeal)
>    Appellate Chief
> Betty Lee Marak (in the district court)
> Tory Green (in the district court)
>    Assistant Federal Public Defenders
>    Federal Public Defender's Office
>    Middle and Western Districts of Louisiana

**Attorneys for the Government - Appellee**

> Camille Ann Domingue (on appeal)
> Catherine Semmes (in the district court)
> Jessica Diane Cassidy (in the district court)
> Robert Frank Moody (in the district court)
>    Assistant United States Attorneys

Lafayette, Louisiana, January 7, 2026.

> *s/Dustin C. Talbot*
> DUSTIN C. TALBOT

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant Maurice Mitchell respectfully requests oral argument to address questions of constitutional dimension and procedural fairness that warrant this Court's careful consideration.

This appeal presents substantial questions under the Second Amendment that merit direct engagement with the panel. Following this Court's decisions in *United States v. Diaz* and its progeny, Mitchell challenges whether the Nation's historical tradition supports permanently disarming individuals whose predicate convictions involved nonviolent drug possession and a single instance of resisting arrest during a trespass incident. These are precisely the types of as-applied challenges that *Diaz* contemplated would require individualized analysis. The constitutional questions presented are novel in their specific application, fact-intensive in their historical analysis, and consequential for individuals like Mitchell whose predicates fall outside the core of founding-era capital offenses.

The procedural issues presented are equally significant and would benefit from oral argument. The district court gave a flight instruction over defense objection despite evidence that failed to support the required

inferences under *United States v. Myers*. The jury's subsequent deadlock followed by conviction after extended deliberation suggests this instruction may have been the decisive factor in a case where the government's evidence was perilously thin. Additionally, the sufficiency challenge raises fundamental questions about what quantum of proof satisfies the government's burden when forensic evidence affirmatively excludes the defendant, when equally plausible alternative suspects exist, and when the investigation leaves basic factual questions unanswered.

These issues involve the intersection of evidence law, jury instructions, and constitutional protections that would benefit from the exchange between counsel and the Court that oral argument provides.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................iii

TABLE OF CONTENTS ...................................................................v

TABLE OF AUTHORITIES ...............................................................ix

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES...........................................................2

1. Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mitchell, where the government failed to demonstrate any historical tradition of permanently disarming individuals convicted of nonviolent drug possession or resisting arrest, and where Mitchell's predicate offenses would not have been punished by death or estate forfeiture at the Founding?

2. [FORECLOSED] Whether 18 U.S.C. § 922(g)(1) exceeds Congress's Commerce Clause authority by criminalizing mere possession of a firearm without requiring that the defendant be currently engaged in economic activity affecting interstate commerce?

3. Whether the district court abused its discretion by instructing the jury on flight over defense objection when the evidence was insufficient to support the required inferences under *United States v. Myers*?

4. Whether the evidence was insufficient as a matter of law to support Mitchell's conviction for knowing possession of a firearm, where the only forensic evidence affirmatively excluded Mitchell as the DNA contributor,

where the government presented no evidence that Mitchell owned the bag containing the firearm or knew of its contents, and where an equally plausible alternative hypothesis pointed to his companion Carmon Pehl?

STATEMENT OF THE CASE ............................................................... 3

    I.    A single firearm in an abandoned bag becomes the basis for federal prosecution ..................................................................... 3

    II.    The government's evidence at trial depicts a chaotic late-night encounter lacking any signs of criminal activity ........................ 5

    III.    The district court instructs the jury that flight demonstrates consciousness of guilt despite the defense's objection .............. 10

    IV.    The jury convicts after first indicating deadlock ...................... 14

SUMMARY OF THE ARGUMENT ...................................................... 15

ARGUMENT ................................................................................... 19

    I.    18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mitchell because the government cannot show a historical tradition of permanently disarming individuals convicted of resisting arrest or possession of drugs ................. 19

        A.    Standard of review: *de novo* ............................................... 19

        B.    The *Bruen/Diaz* test ....................................................... 19

        C.    Mitchell's convictions for resisting arrest and drug possession have no historical analogues that would justify permanent disarmament ...................................... 24

            1.    The Second Amendment's plain text covers Mitchell's conduct .............................................................. 24

2.  Founding-era crimes punishing receipt, possession, and trafficking in illicit contraband are not historical analogues to modern drug possession crimes..............25

3.  Mitchell's predicate conviction for attempting to disarm a peace officer is not a crime of violence subject to disarmament..............29

II.   [FORECLOSED] Section 922(g)(1) is unconstitutional because it exceeds Congress's power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted in this case..............34

A.  Standard of review: *de novo*..............34

B.  Section 922(g)(1) exceeds Congress's power to regulate interstate and foreign commerce..............34

III.  The district court abused its discretion by instructing the jury on flight when the evidence was insufficient to support the necessary inferences..............41

A.  Standard of review: abuse of discretion..............41

B.  Applicable law: a flight instruction is improper unless the evidence supports four required inferences..............42

C.  Argument..............43

1.  The evidence here fails to support the second and fourth required inferences..............43

2.  The *Myers* instruction that the government proposed has already been found to create reversible error.......46

　　　3.　　The danger of unfair prejudice substantially outweighed any probative value ................................. 48

IV.　The trial evidence was insufficient and failed to establish that Mitchell knowingly possessed the firearm concealed in the bag ................................................................................. 50

　　A.　Standard of review ......................................................... 50

　　B.　Applicable law................................................................. 51

　　C.　Argument ........................................................................ 53

　　　1.　The government presented no evidence linking Mitchell to the firearm.................................................53

　　　2.　The forensic evidence affirmatively excludes Mitchell as the source of DNA on the firearm ..........................55

　　　3.　No rational juror could exclude the reasonable hypothesis that the bag belonged to Carmon Pehl .....57

　　　4.　Mitchell's contemporaneous statements contradict knowing possession ......................................................60

　　　5.　The government's incomplete investigation left critical questions unanswered .....................................61

　　　6.　The cumulative weight of these deficiencies renders the evidence insufficient ...........................................62

CONCLUSION ........................................................................................66

CERTIFICATE OF SERVICE ............................................................67

CERTIFICATE OF COMPLIANCE ....................................................67

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                    <u>PAGE</u>

*Alderman v. United States*, 562 U.S. 1163 (2011)..................................36

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................... 19, 20, 24

*Erlinger v. United States*, 602 U.S. 821 (2024) .....................................45

*Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980).......................................................37

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ..............................................................................37

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) ...................................................................... *passim*

*Scarborough v. United States*, 431 U.S. 563 (1977) ...............35-37, 39-40

*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013).................. 35, 40

*United States v. Bullock*, 123 F.4th 183 (5th Cir. 2024) ........................32

*United States v. Clark*, 582 F.3d 607 (5th Cir. 2009)...........................19

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024)...........26-29, 34

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)....................22

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) (en banc).........51

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024)..................... *passim*

*United States v. Doucet*, No. 24-30656, 2025 WL 3515404 (5th Cir. Dec. 8, 2025) (unpublished)............................................. 25, 29, 32

*United States v. Duarte*, 101 F.4th 657 (9th Cir.), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024), *and on reh'g en banc*, 137 F.4th 743 (9th Cir. 2025) ..................................27

*United States v. Fields*, 977 F.3d 358 (5th Cir. 2020)............................52

*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019)...............................36

*United States v. Hinojosa*, 349 F.3d 200 (5th Cir. 2003) .................. 53, 54

*United States v. Jimenez-Elvirez*, 862 F.3d 527 (5th Cir. 2017) ...........51

*United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025) ............................................................……….25, 28, 29, 32, 33

*United States v. Kuban*, 94 F.3d 971 (5th Cir. 1996)............................36

*United States v. Lamartiniere*, 100 F.4th 625 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1069 (2025) ......................................................51

*United States v. Lopez*, 514 U.S. 549 (1995) ...............................35-37, 40

*United States v. Martinez*, 190 F.3d 673 (5th Cir. 1999)................. 42, 43

*United States v. Mergerson*, 4 F.3d 337 (5th Cir. 1993) ........................52

*United States v. Meza*, 701 F.3d 415 (5th Cir. 2012) ......................52, 53

*United States v. Morrison*, 529 U.S. 598 (2000) ....................................40

*United States v. Munoz*, 150 F.3d 401 (5th Cir. 1998)...........................52

*United States v. Murphy*, 996 F.2d 94 (5th Cir. 1993)..........................43

*United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977)................. *passim*

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *rev'd*, 602 U.S. 680 (2024) ..............................................................21, 26, 33

x

*United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025)..........................32

*United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022).....................35, 36

*United States v. Smith*, 997 F.3d 215 (5th Cir. 2021)................52, 54, 57

*United States v. Williams*, 775 F.2d 1295 (5th Cir. 1985) ...............42, 47

*United States v. Wright*, 24 F.3d 732 (5th Cir. 1994) ............................52

## STATUTES

U.S. Const. amend. II ................................................................... *passim*

18 U.S.C. § 922(g)(1).................................................................. *passim*

18 U.S.C. § 3231 ................................................................................. 1

18 U.S.C. § 3742 ................................................................................ 2

28 U.S.C. § 1291 ................................................................................2

## OTHER SOURCES

Fifth Circuit Pattern Jury Instructions (Criminal Cases) 2.43D (2024)
................................................................................................51

Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 Va. L. Rev. 971 (1970)........27

David F. Musto, *The American Experience with Stimulants and Opiates*, 2 Persps. On Crime & Just. 51 (1998)............................27

Donna J. Spindel & Stuart W. Thomas, Jr., *Crime and Society in North Carolina 1663-1740*, 49 J. S. Hist. 223 (S. Hist. Ass'n 1983) ........ 31

In the
United States Court of Appeals
for the Fifth Circuit

---

No. 25-30438

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

MAURICE MITCHELL,

*Defendant - Appellant*

---

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 3:24-CR-164-1

---

## ORIGINAL BRIEF FOR THE APPELLANT
## MAURICE MITCHELL

---

## STATEMENT OF JURISDICTION

This matter originated in the United States District Court for the Western District of Louisiana. The district court's jurisdiction arose under 18 U.S.C. § 3231 inasmuch as the action involved an allegation of an offense against the United States. This is an appeal of a final judgment entered by the district court on August 1, 2025. ROA.253.

1

Appellant filed a timely notice of appeal on August 6, 2025. ROA.259. As such, this Court's jurisdiction to review the matter is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

STATEMENT OF THE ISSUES

1.    Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mitchell, where the government failed to demonstrate any historical tradition of permanently disarming individuals convicted of nonviolent drug possession or resisting arrest, and where Mitchell's predicate offenses would not have been punished by death or estate forfeiture at the Founding?

2.    [FORECLOSED] Whether 18 U.S.C. § 922(g)(1) exceeds Congress's Commerce Clause authority by criminalizing mere possession of a firearm without requiring that the defendant be currently engaged in economic activity affecting interstate commerce?

3.    Whether the district court abused its discretion by instructing the jury on flight over defense objection when the evidence was insufficient to support the required inferences under *United States v. Myers*?

4.      Whether the evidence was insufficient as a matter of law to support Mitchell's conviction for knowing possession of a firearm, where the only forensic evidence affirmatively excluded Mitchell as the DNA contributor, where the government presented no evidence that Mitchell owned the bag containing the firearm or knew of its contents, and where an equally plausible alternative hypothesis pointed to his companion Carmon Pehl?

## STATEMENT OF THE CASE

### I.    A single firearm in an abandoned bag becomes the basis for federal prosecution

On August 7, 2024, a federal grand jury returned a one-count indictment charging Maurice Mitchell with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). ROA.14. The indictment arose from events on the night of January 8, 2023, when Mitchell was riding a bicycle through the Arrowhead Mini Storage facility in West Monroe, Louisiana.

Before trial, Mitchell moved to dismiss the indictment on two grounds. First, he argued that 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to him under the historical analysis required by *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). ROA.21-30. Second, he challenged the statute as exceeding

3

Congress's Commerce Clause authority, but acknowledged this claim is presently foreclosed in this Circuit. ROA.21-30. The district court denied both claims in a memorandum ruling holding that *Bruen* did not disturb older Circuit precedent barring Second Amendment challenges to § 922(g)(1). ROA.32-40.

On November 7, 2024, Mitchell filed a second motion to dismiss the indictment, relying on the new decision in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), which held that *Bruen* did abrogate previous Second Amendment jurisprudence under § 922(g)(1) and that defendants can mount as-applied Second Amendment challenges to § 922(g)(1). ROA.56-59. The government responded that Mitchell had felony convictions for (1) Attempted Disarming of a Peace Officer, and (2) Possession of a Firearm by a Convicted Felon, Possession of Oxycodone, Possession of Cocaine, Possession of Marijuana – Second Offense, and Resisting an Officer by Flight on Foot. ROA.72-73. The government argued that Mitchell's drug possession priors were analogous to founding-era crimes punishing receipt, possession, and trafficking in illicit contraband. ROA.74. The government also argued that Mitchell's prior conviction for Attempting to Disarm a Peace Officer made him a

threat to public safety, and thus he could be disarmed as a dangerous person. ROA.78-79. Mitchell replied that there is no historical basis for punishing those who possessed or delivered intoxicants with death or estate forfeiture. ROA.86-88. Mitchell also replied that there is no historical basis to disarm someone who intentionally evaded arrest. ROA.88-89. The district court denied Mitchell's Second Amendment claim on January 14, 2025.[1]

## II. The government's evidence at trial depicts a chaotic late-night encounter lacking any signs of criminal activity

Mitchell proceeded to trial. The government's case rested on the testimony of three Ouachita Parish Sheriff's deputies who responded to a burglary call at Arrowhead Mini Storage around 10:40 p.m. on January 8, 2023. Deputy Daniel Sams testified that he was on patrol that night as a patrol deputy. ROA.489. He was riding with Corporal Hurd, who was his training officer, and Deputy Sams was the primary officer for the

---

[1] Mitchell also filed a motion to suppress all evidence obtained following his encounter with law enforcement, arguing that deputies lacked reasonable suspicion to stop him and that his subsequent flight did not justify the seizure of evidence. ROA.42. Following a hearing on November 4, 2024, ROA.55, the magistrate judge issued a Report and Recommendation denying the motion. ROA.105. Mitchell did not object to the Report and Recommendation and the district court adopted that recommendation on January 28, 2025. ROA.124.

incident. ROA.489. Hurd testified that deputies were in a marked unit and were in uniform. ROA.332.

Deputy Sams testified that dispatch told him there was a possible active burglary in progress at Arrowhead Mini Storage. ROA.489. Specifically, at 10:41 p.m. a caller advised "there are two male subjects breaking into the storage units" and that "both subjects wearing dark clothing, carrying bolt cutters, advised they were at the opposite side of the office." ROA.491.

Officer Hurd testified that he and Deputy Sams arrived at Arrowhead Mini Storage within minutes of receiving the dispatch. ROA.333. They did not activate their lights and sirens. ROA.333. Hurd testified that he observed a white female, identified as Carmon Pehl, walking and Mitchell riding a bicycle coming from a row of storage units. ROA.334. He testified that they identified themselves to Mitchell, and that he turned the bicycle and attempted to ride away. ROA.340. He testified that Mitchell quickly crashed his bike into a ditch. ROA.340-41. After the bike crashed, Mitchell threw down his jacket and fled on foot but was quickly apprehended. ROA.340. Hurd testified that the entire encounter from when they made contact with Mitchell until he was taken

into custody was less than one minute. ROA.344-45. Ms. Pehl was also arrested on unrelated drug charges. ROA.338-39.

Officer Hurd testified that after Mitchell was in custody, deputies went back to where he had crashed his bike. ROA.344. They located the bike, the jacket Mitchell had thrown down, and "the bag that was on the front of the bike around on the handlebars." ROA.344. Hurd testified that the bike was a blue Mongoose. ROA.344. Hurd testified that he had no doubt the bag was associated with the bike because "we saw Mitchell leave away from us, crash the bike. The bike stayed there. And the bag was on the front of the bike the whole time. When we got it out of the ditch, it was -- the panel was wrapped around the handlebars still." ROA.345. Hurd testified that Deputy Sams searched the bag while Hurd supervised, and they located a loaded firearm, specifically a revolver, and a spent shell casing of the same caliber. ROA.345.

The testimony of the officers revealed troubling gaps in the investigation. Officer Hurd testified that he did not recall whether he was wearing gloves while handling the evidence. ROA.359. Deputy Sams testified that he took no photographs of the scene, the bicycle, or the satchel. ROA.498. Sams testified that he collected only the firearm and

7

spent shell casing as evidence, and did not collect the bike or the bag. ROA.497-98. Incredibly, Sams testified that he "likely" just left the bike and bag there in the ditch. ROA.496. Hurd testified that neither he nor Sams found any signs of a break-in at the storage facility. ROA.360-61. Nobody ever contacted Megan Mazur, the person who had called in the burglary complaint. ROA.360-61, 499.

The government presented additional witnesses at trial. Gary Underwood testified that he is the owner and operator of Arrowhead Mini Storage. ROA.363. Underwood testified that his storage facility is surrounded by trailer parks and that there are no fences around his storage units. ROA.370. He agreed that residents at the trailer parks routinely cut through his storage facility on their way to the nearby convenience stores. ROA.370-71.

Underwood testified that he was never even contacted by the Ouachita Parish Sheriff's Office after this incident and only learned about it when he saw the booking photo of Carmon Pehl online. ROA.374. Underwood testified that he knew Carmon Pehl because he commonly saw her at unit I-18 at his storage facility with a storage unit door open. ROA.365. Unit I-18 was rented by and paid for by David Moss.

8

Underwood believed Pehl was actually living in Unit I-18 and would often see her arrive *on a bicycle*. ROA.375. Several days after Pehl and Mitchell were arrested and officers left the bicycle in the ditch, Underwood saw Pehl again at his storage facility riding her bike. ROA.376.

Josephine Little testified that in January 2023, Mitchell was her boyfriend. ROA.393. She testified that Mitchell had a gray Ford Mustang, a gray Ford Expedition, and a blue bicycle. ROA.393. Ms. Little testified that she received telephone calls from Mitchell from jail. ROA.394. On one phone call Mitchell tells Little that he was "helping a person" "unlock the damn thing and got charged." Government Exhibit 6.

ATF Special Agent Megan McWaters testified as an expert on firearms and interstate commerce, and testified that the Astra revolver is a .38 Special revolver that was manufactured by Astra in Spain and imported into the United States by Century Arms International, which is based in Vermont. ROA.450-53.

The government presented no fingerprint evidence linking Mitchell to the firearm. Kari Dicken, a senior forensic scientist with the North Louisiana Criminalistics Laboratory, testified as an expert in forensic DNA analysis. ROA.454-58. Dicken testified that she received two swabs

from an Astra .38 caliber revolver and a DNA reference sample from Maurice Mitchell. ROA.458. She testified that she obtained a partial DNA profile from the swabs from the firearm. ROA.469. Dicken testified that when she compared the partial profile to the DNA of Maurice Mitchell, the partial DNA profile from the firearm was from a single individual and that DNA profile was inconsistent with the reference sample from Maurice Mitchell.ROA.469. She testified that "inconsistent" means "the DNA profiles are different" and that Mitchell "is excluded as a contributor to the DNA profile collected from the swabs from the firearm." ROA.469. She testified that she cannot say whether Mitchell did or did not handle the firearm. ROA.470.

## III. The district court instructs the jury that flight demonstrates consciousness of guilt despite the defense's vigorous objection

Before trial, the government requested a special jury instruction on flight[2] citing *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977).

---

[2] The government's proposed flight instruction:

The intentional flight of a defendant immediately after the commission of a crime or after he is accused of a crime that has been committed is not, sufficient evidence in itself to establish his guilty, but is a fact which, if proved, may be considered by the jury in light of all other evidence in the case in determining the guilty or innocent, whether or not evidence of flight shows a consciousness of guilty and the significance to be attached to any such evidence are matters exclusively

ROA.177.[3] The defense objected, arguing that the government could not support the four inferences required under Fifth Circuit precedent: (1) that Mitchell's conduct constituted flight, (2) that his flight resulted from consciousness of guilt, (3) that the flight related to the charged crime, and (4) that he felt guilty because he actually committed the crime. ROA.186-89.

The defense emphasized that the same instruction proposed by the government had created reversible error in *Myers* because the evidence was insufficient to support all four inferences. ROA.186-87. Mitchell's statement to police officers that he ran because he was scared and his statement to his girlfriend that he was just trying to help someone contradicted any inference of consciousness of guilt regarding firearm possession. ROA.187.[4] Moreover, requiring the court to find that Mitchell

within the province of the jury. In considering any evidence of light, the jury should consider the motive which prompted it.

ROA.177.

[3] This proposed instruction contained several typographical errors, ROA.177, as the government later acknowledged. ROA.433-36.

[4] At trial, Sams testified that after arresting him, Mitchell told him he ran because he was scared. ROA.495. On a recorded jail phone call Mitchell tells his girlfriend that he was "helping a person" "unlock the damn thing and got charged." Government Exhibit 6.

11

committed the charged crime before instructing the jury would usurp the jury's role as factfinder. ROA.187.

The defense clearly objected to *any* flight instruction. *See* ROA.188 ("Mitchell prays that the Government's requested flight instruction be denied."). Mitchell also proposed an *alternative* flight instruction to be used *only if* the court denied his objection to the giving a flight instruction. The key distinction in Mitchell's proposed instruction was the inclusion of language allowing the jury to infer "guilty knowledge or fear," rather than solely consciousness of guilt. ROA.188[5].

At the end of the first day of trial, the court made clear to the parties that it intended to give a flight instruction, but was unsure which version

---

[5] The defense requested the following flight instruction if the court denied the objection:

> You have heard testimony in this trial that the defendant fled from law enforcement officers. Intentional flight immediately after a crime has been committed, and/or while a crime is ongoing, is not, of course sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you, in light of all the evidence in this case, in determining guilt or innocence. The defendant's flight is a circumstance from which you can infer guilty knowledge or fear. Whether the defendant's conduct in this case constituted flight is exclusively for you to determine. If you do so determine, whether or not that flight showed a consciousness of guilt on the defendant's part and the significance to be attached to that evidence are also matters exclusively within your province.

ROA.188

12

of the flight instruction to give and wanted to research the issue overnight. ROA.431-33. Mitchell never abandoned or withdrew his objection to giving any flight instruction.

In the charge conference the following morning of trial, the court informed the parties that it developed its own flight instruction that the court believed to be a compromise between the two proposed instructions by the parties. ROA.442-43. The court's version largely modeled that of the government's with an additional cautionary language about considering innocent reasons for flight. In response to this compromise flight instruction, defense counsel indicated there was no objection to the version of the flight instruction proposed by the court. ROA.443. But, defense counsel never withdrew or waived its objection previously filed into the record that no flight instruction was proper in this specific case.

Following the close of evidence on April 10, 2025, the court gave the following flight instruction to the jury:

> The intentional flight of the defendant immediately after the commission of a crime or after he's accused of a crime that has been committed, is not sufficient evidence in itself to establish his guilt, but is a fact which, if proved, may be considered by the jury in light of all other evidence in the case in determining whether guilt -- determining guilt or innocence. Whether evidence of flight shows a conscientious -- a consciousness of guilt and the significance to be attached to

13

any such evidence, are matters exclusively within the province of the jury.

In considering any evidence of flight, if you find there was any flight, you should also consider there may -- there may be reasons for flight that are fully consistent with innocence and the jury should consider the motive which prompted it.

ROA.553.

## IV.    The jury convicts after first indicating deadlock

Trial commenced on April 9, 2025, and concluded the following day. ROA.276, 282. At the close of the government's case, the defense moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that no rational juror could find that Mitchell knowingly possessed the firearm. ROA.482. The district court denied the Rule 29 motion. ROA.486.

The jury began deliberations at 2:33 p.m. on April 10, 2025. ROA.215. At approximately 5:00 p.m., after deliberating for more than two hours, the jury sent a note asking what they should do if they could not come to a unanimous verdict. ROA.554. The court responded that the jury could either order dinner and continue deliberating or return in the morning to continue deliberating. ROA.555. The jury chose to order dinner and continue deliberating. ROA.556. The jury returned a guilty

verdict at 7:40 p.m., approximately two hours and forty minutes after indicating they were deadlocked. ROA.215.

The district court sentenced Mitchell on July 31, 2025, to a within-guideline sentence of 36 months' imprisonment, followed by three years of supervised release. ROA.253-55. Mitchell filed a timely notice of appeal on August 6, 2025. ROA.259.

## SUMMARY OF THE ARGUMENT

Mitchell's conviction cannot stand. The government charged him with being a felon in possession of a firearm based solely on his proximity to a bag attached to a bicycle he was riding through a storage facility. But proximity is not possession, and suspicion is not proof beyond a reasonable doubt. The district court's legal errors and the government's failure of proof require reversal.

*First*, the statute as applied to Mitchell violates the Second Amendment under the framework established by *New York State Rifle & Pistol Association v. Bruen* and refined by this Court in *United States v. Diaz*. Mitchell's predicate convictions involved nonviolent drug possession and a single instance of attempted disarming during a trespass arrest where he grabbed at an officer's duty belt while being

tased and was quickly subdued. The government cannot demonstrate that the founding generation permanently disarmed individuals for these offenses. To the contrary, the historical record shows that early Americans used intoxicating substances freely without restriction or criminal sanction, and that resistance to arrest resulted in temporary punishment, not permanent civil disability. This Court has repeatedly rejected the government's attempts to analogize drug possession to founding-era contraband offenses, recognizing that such comparisons stretch analogical reasoning too far. Without a historical tradition supporting permanent disarmament for Mitchell's specific predicates, his prosecution violates the Second Amendment's text and history.

*Second*, the district court abused its discretion by giving a flight instruction when the evidence could not support the four inferences required under *United States v. Myers*. Mitchell told officers immediately after his arrest that he ran because he was scared—not because he felt guilty about possessing a concealed firearm. His recorded statement to his girlfriend that he was "helping a person" unlock a storage unit contradicts consciousness of guilt. The flight instruction invited jurors to infer guilt from conduct Mitchell explained as fear, and the jury's two-

16

hour deadlock followed by conviction suggests this improper instruction tipped the scales in a closely balanced case. The district court's determination that Mitchell felt guilty because he actually committed the crime—a prerequisite for the fourth *Myers* inference—impermissibly usurped the jury's role as factfinder and found no basis in the trial evidence.

*Third*, the evidence was insufficient to support Mitchell's conviction for knowing possession. The government presented no evidence that Mitchell owned the bag, knew what was inside, or had any connection to the firearm beyond riding a bicycle to which an opaque bag was attached. The DNA evidence does not merely fail to connect Mitchell to the weapon—it affirmatively excludes him and identifies an unknown person who handled the firearm. The government never tested whether that DNA belonged to Carmon Pehl, Mitchell's companion that night, who lived at the storage facility and routinely traveled there by bicycle. The government never photographed the scene, never preserved the bag or bicycle as evidence, never conducted fingerprint analysis, and never investigated ownership of the bag. When forensic evidence excludes the defendant, when an equally plausible alternative suspect exists, when

17

the defendant's statements contradict guilty knowledge, and when the investigation leaves basic questions unanswered, no rational juror could find possession beyond a reasonable doubt.

The jury's difficulty reaching a verdict confirms the insufficiency of proof. After more than two hours of deliberation, jurors indicated they were deadlocked. They deliberated another two hours and forty minutes before returning a guilty verdict—a timeline suggesting that the improper flight instruction may have broken an otherwise irresolvable impasse. The government asks this Court to sustain a conviction based entirely on speculation: that Mitchell knew what was in an opaque bag attached to a bicycle he was riding, despite forensic evidence excluding him, despite the presence of an alternative suspect, and despite a deficient investigation that failed to answer basic questions about ownership and knowledge. The law does not permit convictions on such a foundation.

This Court should reverse Mitchell's conviction and remand with instructions to enter a judgment of acquittal, or alternatively, remand for a new trial without the improper flight instruction.

18

## ARGUMENT

I.  **18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mitchell because the government cannot show a historical tradition of permanently disarming individuals convicted of resisting arrest or possession of drugs**

### A.  Standard of review: *de novo*

Mitchell preserved his as-applied constitutional challenge to 18 U.S.C. § 922(g)(1) by raising the claim below and then proceeding to trial. ROA.21, 56, 85. The Court reviews constitutional challenges to a statute *de novo*. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009).

### B.  The *Bruen/Diaz* Test

The Second Amendment mandates that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that a Washington D.C. law that prohibited possession of handguns in the home was unconstitutional. The Court interpreted the language of the Second Amendment and determined that its drafters intended for it to protect "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Thus, D.C.'s categorical prohibition did not pass constitutional muster. *Id.* at 628-29.

19

In 2022, the Supreme Court revisited and refined *Heller* in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). There, the Court extended *Heller*'s protection for carrying handguns in the home to carrying them publicly. *Id. at* 8-9. In so doing, the Court also clarified the correct two part test for assessing whether a gun regulation violates the Second Amendment. In the first step, the Court considers whether the challenged law impinges upon a right protected by the Second Amendment. *Id.* at 19. When step one's requirements are met, the Constitution presumptively protects that conduct. The burden then shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. This involves addressing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The *Bruen* Court held that the plain text of the Second Amendment protects the right to bear arms in public for self-defense, and that the government had failed to "identify an American tradition" justifying the regulation of such behavior. *Id.* at 38-39. The challenged New York law thus violated the Second Amendment.

This Court applied *Bruen* to find § 922(g)(8) unconstitutional in *United States v. Rahimi*, 61 F.4th 443, 450-51 (5th Cir. 2023), *rev'd*, 602 U.S. 680 (2024) (hereinafter "*Rahimi I*"). The *Rahimi I* panel considered various "historical analogues" and found that they were not "relevantly similar" precursors to § 922(g)(8). *Id.* at 456. The Supreme Court reversed. 602 U.S. at 701-02. An eight-Justice majority held that § 922(g)(8) "fits comfortably" in this Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690. The Court first cited surety laws as a historical analogue. Those laws required individuals to post bonds whenever there was a "probable ground to suspect of future misbehaviour." *Id.* at 695 (quoting 4 Blackstone 251). Surety laws were used to "prevent all forms of violence, including spousal abuse" and the misuse of firearms. *Id.* at 695. The Court also relied on "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 697 (brackets omitted) (quoting 4 Blackstone 149). Because such conduct "disrupted the public order and led almost necessarily to actual violence .... the law punished these acts with forfeiture of the arms and imprisonment." *Id.* (cleaned up).

21

In *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), this Court issued its first decision analyzing a post-*Bruen* facial and as-applied constitutional challenge to § 922(g)(1). The *Diaz* Court first rejected the three main arguments advanced by the government. First, *Diaz* held that *Bruen* established a "new historical paradigm for analyzing Second Amendment claims" which rendered prior Circuit precedent (like *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)) obsolete. *Id.* at 465. Second, *Diaz* held that felons are among "the people" protected by the Second Amendment. *Id.* at 466. Third, *Diaz* held that the "plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Id.* at 467.

Thus, according to *Diaz*, the burden shifted to the government to demonstrate that regulating Diaz's possession of a firearm is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 467 (quoting *Bruen*, 597 U.S. at 24).

> To satisfy this burden, the government must "identify a well-established and representative historical analogue, not a historical twin." Evidence must be "relevantly similar" to the challenged law. In assessing similarity, we consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."

*Id.* at 467 (citations omitted).

> To survive Diaz's as-applied challenge, the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to this.

*Id.* at 467. The Court explained that when assessing the government's proffered historical analogues, the Court can *only* consider the defendant's predicate offenses under § 922(g)(1) that are "punishable by imprisonment for a term exceeding one year." Other prior convictions, arrests, or other conduct are "not relevant for our purposes." *Id.* at 467.

The Court then held that whether § 922(g)(1) is constitutional as applied to a particular defendant depends on whether the underlying felony conviction would have been punished by death or estate forfeiture at the Founding. *Id.* at 467-70. Because capital punishment and estate forfeiture "permanently punish[ed] offenders" convicted of certain crimes, the Court reasoned, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.* at 469. The Court looked at Diaz's prior conviction for felony vehicle theft and noted that those convicted of horse theft historically (an analogue to vehicle theft) were often subject to the death penalty which established that our country has a historical tradition of severely punishing people like Diaz

who have been convicted of vehicle theft. *Id.* at 468-69. The Court left the door open, however, to "as-applied challenges by defendants with different predicate convictions" that were not severely punished at the Founding. *Id.* at 470 n.4.

### C. Mitchell's convictions for resisting arrest and drug possession have no historical analogues that would justify permanent disarmament

#### 1. The Second Amendment's plain text covers Mitchell's conduct

The first step of the *Bruen* analysis is satisfied here. This Court has already held that "the plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467. The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Mitchell, as one of "the people," sought to possess a firearm—conduct squarely within the Amendment's text. *See Heller*, 554 U.S. at 580 (the term "the people" "unambiguously refers to all members of the political community"). Since the first step is satisfied, the burden shifts to the government to demonstrate that regulating Mitchell's possession of a firearm is consistent with the Nation's historical tradition of firearm regulation.

### 2. Founding-era crimes punishing receipt, possession, and trafficking in illicit contraband are not historical analogues to modern drug possession crimes

The government contended below that Mitchell's drug possession convictions justify permanent disarmament because founding-era laws severely punished those who received, possessed, or trafficked in illicit contraband such as stolen horses, stolen mail, and counterfeit securities. ROA.74. But this Circuit has repeatedly rejected that comparison. In *United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025), this Court confronted the government's reliance on those same founding-era felonies as historical analogues to modern drug laws. *Id.* at 314. The Court rejected the analogy, finding it operated at too high a level of generality and stretched analogical reasoning too far. *Id.* Those founding-era offenses concern theft, fraud, or deceit, not the use and sale of addictive drugs. *Id.* at 313. *Kimble* thus forecloses the government's argument that Mitchell's drug possession convictions are relevantly similar to crimes involving stolen goods or counterfeited currency.

The same result followed in *United States v. Doucet*, No. 24-30656, 2025 WL 3515404 (5th Cir. Dec. 8, 2025) (unpublished), where this Court again rejected the government's attempt to analogize attempted

25

marijuana cultivation to contraband trafficking offenses. *Id.* at *3. The panel explained that although both types of offenses might advance a common goal of eliminating traffic in illicit goods, the comparison stretches the analogical reasoning prescribed by *Bruen* and *Rahimi* too far. *Id.* (citing *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024)). Mitchell's convictions for possessing oxycodone, cocaine, and marijuana fall squarely within this reasoning. These are drug possession offenses, not crimes involving theft, fraud, deceit, or trafficking in stolen property.

The government's reliance on contraband analogies fails for another fundamental reason. There were simply no founding-era laws regulating the production, possession, or use of intoxicating substances. As this Court recognized in *Connelly*, the founding generation was intimately familiar with various intoxicants, including alcohol, tobacco, and even opium. 117 F.4th at 279-80. The Court noted that there was "very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century." *Id.* at 279. Indeed, there is "no evidence of public concern for, or understanding of, marijuana" as an intoxicant until the mid-1930s. *Id.* (citing Richard J. Bonnie & Charles

26

H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 Va. L. Rev. 971, 1011 (1970)).

The historical record reveals that early Americans widely used intoxicating substances without restriction. As scholars have noted, "the United States was the only major Western nation to allow unlimited distribution, sale, and promotion of narcotics." David F. Musto, *The American Experience with Stimulants and Opiates*, 2 Persps. On Crime & Just. 51, 56 (1998); *see also United States v. Duarte*, 101 F.4th 657, 691 n.16 (9th Cir.) ("Before [the early 20th century], what we now think of as 'illicit drugs,' such as opium and cocaine, 'were ... legal in the United States' for a long stretch of this country's history."), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024), *and on reh'g en banc*, 137 F.4th 743 (9th Cir. 2025).

Despite widespread use of intoxicating substances during the founding era, there are no examples of colonial laws regulating or prohibiting drug use or possession—let alone laws permanently disarming those who possessed or used such substances. As this Court observed in *Connelly*, "the government can identify no laws at the

27

Founding that approximate § 922(g)(3)." 117 F.4th at 280. The same is true for § 922(g)(1) as applied to drug possession.

This absence is particularly significant given the Founders' familiarity with drugs and alcohol. Thomas Jefferson, for example, wrote that "light and high flavored wines" were a "necessary of life" for him. *Connelly*, 117 F.4th at 280 n.4. George Washington operated one of the nation's largest distilleries. *Id.* The founding generation neither criminalized these activities nor restricted firearm rights based on the production or use of intoxicating substances.

Most significantly, the government cannot satisfy its burden through the type of categorical dangerousness determination it argued below. This Court has made clear that the Second Amendment allows Congress to disarm people it reasonably deems dangerous, but only if such a disarmament regime is consistent with *Bruen*'s how and why test. *Kimble*, 142 F.4th at 315. The shifting benchmark of felony status does not define the limits of the Second Amendment. *Diaz*, 116 F.4th at 469. Instead, the government must identify a class of persons at the founding who were dangerous for reasons comparable to those Congress seeks to disarm today. *Kimble*, 142 F.4th at 315.

The government has offered no such showing here. Mitchell's drug possession convictions involved no violence whatsoever. The presentence report contains no allegations that these offenses threatened violence or caused physical injury. Without evidence connecting Mitchell's past drug possession to violent or dangerous conduct, the government cannot establish that he fits within a class of persons historically deemed too dangerous to possess firearms. *Cf. Connelly*, 117 F.4th at 278-79 (rejecting dangerousness argument where government failed to show how marijuana use predisposed individual to armed conflict). The government's contraband analogy, already rejected by this Court in *Kimble* and *Doucet*, cannot salvage its burden under *Bruen*.

### 3.    Mitchell's predicate conviction for attempting to disarm a peace officer is not a crime of violence subject to disarmament

The government argued below that Mitchell's February 2017 conviction for attempted disarming a peace officer establishes him as a threat to public safety and analogizes that offense to theft. Neither argument withstands scrutiny. According to the presentence report, Mitchell pled guilty to attempting to disarm a peace officer after an incident at a convenience store where he had been told not to return.

When an officer attempted to arrest him, Mitchell pushed himself off the patrol car and attempted to pull his hand away. Another officer attempted to subdue him by dry stunning him with a taser, and Mitchell grabbed at the officer's duty belt and attempted to disarm his *pepper spray*. Mitchell was quickly handcuffed and taken into custody. He received a sentence of one year imprisonment and was paroled within a year. (Final PSR, Doc. 108, p.8).

This offense does not demonstrate the type of dangerousness that would justify permanent disarmament under founding-era principles. Most critically, Mitchell did not successfully disarm anyone—he attempted to grab pepper spray while being tased during a trespass arrest, and the entire incident ended with his immediate custody. The Louisiana court's own assessment of this conduct—reflected in Mitchell's one-year sentence and swift parole—confirms that even the convicting jurisdiction viewed this as a relatively minor offense involving momentary resistance, not predatory violence or dangerous criminality.

The government has identified no founding-era tradition of permanently disarming individuals who resisted arrest. To the contrary, in colonial North Carolina, the punishment for contempt of authority,

charged against those who harassed law enforcement officers, failed to answer a court order, or *resisted arrest*, was a fine and imprisonment depending upon the seriousness of the act. Donna J. Spindel & Stuart W. Thomas, Jr., *Crime and Society in North Carolina 1663-1740*, 49 J. S. Hist. 223, 232 (S. Hist. Ass'n 1983); *see also id* (providing examples where (1) an arrestee "beat wound and evill entreat[ed]" the arresting officer, and (2) an arrestee "[b]atter[ed] and otherwise abuse[d]" the arresting officer). Significantly, even these more serious acts of resistance—involving actual battery of officers, not mere attempts—resulted in temporary punishment, not permanent civil disability. The founding generation simply did not disarm those who resisted lawful authority.

The government's attempt to analogize attempted disarming to theft fares no better. While the government argues that both involve the taking of something of value from another, this superficial comparison collapses under scrutiny. Mitchell did not successfully take anything. He attempted to pull away from officers during his arrest and grabbed at an officer's duty belt in an apparent effort to avoid being tased or pepper sprayed. This brief, unsuccessful resistance during a trespass arrest cannot be equated with the systematic theft of horses, an offense that

founding-era legislatures punished with death because horse theft threatened victims' livelihoods and often left them stranded in dangerous conditions. The analogy the government draws would permit permanent disarmament for any failed attempt to evade arrest—a result that would render the Second Amendment a nullity for a vast swath of citizens based on momentary, non-violent resistance.

More fundamentally, this Court's recent decisions make clear that not all felonies warrant the same level of scrutiny under *Bruen*. In *Doucet*, the Court distinguished between two categories of offenses that might support disarmament under a dangerousness rationale. 2025 WL 3515404, at *4. The first includes offenses that expressly involve dangerous or violent acts like aggravated battery or manslaughter. *Id.* (citing *United States v. Schnur*, 132 F.4th 863, 870 (5th Cir. 2025); *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024)). The second encompasses non-violent offenses that often lead to, or are associated with, acts of violence, such as drug trafficking. *Id.* (citing *Kimble*, 142 F.4th at 316). Mitchell's conviction fits neither category. It is not an expressly violent offense—no one was injured, no weapon was used, no substantial harm occurred

Attempting to pull away from officers and grabbing at a duty belt during a trespass arrest is neither a violent offense nor one that leads to violence. The government presented no evidence that Mitchell injured anyone, used a weapon, or engaged in conduct creating a substantial risk of physical harm. He was subdued with a dry stun from a taser and taken into custody. The state court sentenced him to one year imprisonment, a sentence that reflects the relatively minor nature of the offense. He was paroled shortly thereafter. This conviction simply does not place Mitchell within a class of persons at the founding who were considered dangerous for reasons comparable to those Congress seeks to disarm today. *See Kimble*, 142 F.4th at 315.

The government cannot meet its burden under *Bruen* by invoking vague terms like violent or dangerous. *Diaz*, 116 F.4th at 467. Words like serious or danger are vague terms, and it is unclear what such a rule would entail. *Rahimi*, 602 U.S. at 699 (rejecting argument that government can disarm individuals who are not responsible). Not all felons today would have been considered felons at the founding. *Diaz*, 116 F.4th at 469. What matters is not how Louisiana chose to classify this offense in 2017, but whether the founding generation would have viewed

such conduct as warranting the severe civil disability of permanent disarmament. They would not have. The government must demonstrate that the nation has a longstanding tradition of disarming someone with a criminal history analogous to Mitchell's. *Id.* at 467. It has failed to make that showing. Mitchell's predicate conviction for attempting to disarm a peace officer, rooted in a brief incident of resistance during a trespass arrest with no resulting injury or violence, cannot justify his permanent disarmament under the Second Amendment's text and history.

II.    **[FORECLOSED] Section 922(g)(1) is unconstitutional because it exceeds Congress's power to regulate interstate and foreign commerce; alternatively, it should be construed to require a closer connection to interstate commerce than alleged or admitted in this case**

A.    **Standard of review:** *de novo*

As with the Second Amendment challenge, the Court reviews this constitutional challenge to the statute *de novo. See Connelly,* 117 F.4th at 273.

B.    **Section § 922(g)(1) exceeds Congress's power to regulate interstate and foreign commerce**

Article I, § 8 of the United States Constitution provides: "Congress shall have power … To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes …." In *United*

34

*States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court established the test for the scope of Congress's power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559. *Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." 431 U.S. 563, 575 (1977). A fair reading of *Scarborough* suggests that the case was concerned solely with statutory interpretation and did not purport to resolve any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). This Court has adhered to the view that *Scarborough's* "minimal nexus" is sufficient both to prove guilt under 18 U.S.C. § 922(g)(1) and to bring any subsequent act of firearm possession within Congress's power to regulate. *See, e.g., United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

35

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional reading of *Scarborough*. *See Alderman v. United States*, 562 U.S. 1163, 1166 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez* …."); *see also United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance[.]"); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part) ("[T]he precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale of" *Lopez*.).

Judge Ho's opinion dissenting from denial of rehearing en banc in *Seekins*, 52 F.4th at 988–92, is the most recent and thorough objection to the established view. "In the en banc poll, seven judges voted in favor of rehearing …, and nine voted against rehearing …." *Id.* at 988.

If *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of citizens. *See Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of

36

certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress's power. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Roberts, C.J.) ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.") (hereinafter "*NFIB*").

This unlimited power renders § 922(g)(1) facially unconstitutional. In *NFIB*, Chief Justice Roberts noted that "[a]s expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching 'activity.'" 567 U.S. at 551 (emphasis added). He reasoned that this limitation of Commerce Clause power to "activities" is a "distinction between doing something and doing nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555 (quoting *Industrial Union Dept., AFL-CIO v.*

37

*American Petroleum Institute*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in judgment)). Four other Justices echoed Chief Justice Roberts's sentiment regarding the Commerce Clause analysis, stating that Congress could only regulate "activity affecting commerce[.]" *NFIB*, 567 U.S. at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

Here, § 922(g)(1) does not require that Mitchell's possession of the gun was an economic activity; this ought to be fatal to the conviction. As explained by *NFIB*, the Commerce Clause permits Congress to regulate only activities, *i.e.*, the active participation in a market. But § 922(g)(1) criminalizes all possession, without reference to economic activity. Accordingly, it sweeps too broadly.

Further, the statute does not require that Mitchell be engaged in the relevant market at the time of the regulated conduct. Chief Justice Roberts also noted that Congress cannot regulate a person's activity under the Commerce Clause unless the person affected is "currently engaged" in the relevant market. *NFIB*, 567 U.S. at 556, 557 (Roberts, C.J.). As an illustration, the Chief Justice provided the following example: "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent

sense." *Id.* at 556. As such, *NFIB* overrules the long-standing notion that a firearm which has previously and remotely passed through interstate commerce should be considered to affect commerce indefinitely without "concern for when the [initial] nexus with commerce occurred." *Scarborough*, 431 U.S. at 577.

Mitchell's case illustrates how this Court's precedent removes any limitation on Congress's commerce power. His indictment alleged that he "did knowingly possess in and affecting commerce a firearm." ROA.14. Here, the sole facts offered to support the commerce element below were that the firearm possessed by Mitchell was manufactured outside of the state of Louisiana and thus travelled in interstate commerce prior to Mitchell's possession. ROA.450-53. The government offered no proof that Mitchell had traveled in interstate commerce to bring the firearm to Louisiana, nor even proof that Mitchell had purchased the firearm from any vendor participating in interstate commerce.

Mitchell thus was convicted under § 922(g)(1) without evidence that he was "currently engaged" in the gun market at the time of his arrest, and without evidence showing how recently he came to possess the gun. So § 922(g)(1) fails to survive *NFIB*s Commerce Clause analysis. The

statute has been construed to require only that the firearm traveled in interstate commerce at some previous time. *See Scarborough*, 431 U.S. at 575. If it cannot be construed to require commercial activity of some kind by the defendant—something more substantial than mere possession of an item that may have crossed state lines years ago—it then contains no jurisdictional element sufficient to bring it within the terms of Congressional power. In the absence of such a jurisdictional element, the Supreme Court has found federal criminal statutes falling substantially outside the Commerce power to be unconstitutional, without pausing to consider whether the particular conduct of the defendant might have affected commerce. *See Lopez*, 514 U.S. at 561; *United States v. Morrison*, 529 U.S. 598, 607 (2000). In other words, without such an element, comparable statutes have been found facially unconstitutional.

Mitchell concedes that this argument was rejected in *Alcantar*, 733 F.3d at 145–46, among other cases, but raises it to preserve the issue for possible further review by the Supreme Court.

III. **The district court abused its discretion by instructing the jury on flight when the evidence was insufficient to support the necessary inferences**

A. **Standard of review: abuse of discretion**

Mitchell preserved this issue by filing a written objection to any flight instruction on April 2, 2025. ROA.186-89. In his objection, Mitchell argued that the government could not support the four inferences required under Fifth Circuit precedent and requested that the court deny the government's proposed flight instruction. ROA.188. Mitchell's objection was clear and unequivocal: "Mitchell prays that the Government's requested flight instruction be denied." ROA.188. Mitchell also proposed an alternative instruction to be given only if the court denied his objection to giving any flight instruction. ROA.188.

The procedural history requires careful attention to avoid any confusion about preservation. At the end of the first day of trial, the court made clear to the parties that it intended to give a flight instruction, but was unsure which version of the flight instruction to give and wanted to research the issue overnight. ROA.431-33. Critically, Mitchell never abandoned or withdrew his objection to giving any flight instruction. ROA.443.

41

At the charge conference on the morning of the second day of trial, the court presented its own compromise flight instruction. ROA.442-43. When defense counsel indicated there was "no objection" to the court's version of the flight instruction, that statement addressed only the wording of the instruction the court had decided to give—not whether any flight instruction should be given at all.ROA.443. Defense counsel never withdrew or waived the objection previously filed that no flight instruction was proper in this case. ROA.443. The distinction matters: Mitchell preserved his argument that the evidence was insufficient to support any flight instruction, regardless of its specific wording.

The district court's decision to give a flight instruction over Mitchell's objection is reviewed for abuse of discretion. *United States v. Martinez*, 190 F.3d 673, 678 (5th Cir. 1999); *United States v. Williams*, 775 F.2d 1295, 1300 (5th Cir. 1985).

### B.    Applicable law: a flight instruction is improper unless the evidence supports four required inferences

Evidence of flight is generally admissible as tending to establish guilt. *Williams*, 775 F.2d at 1300. However, a flight instruction is proper only when the evidence supports four inferences: (1) the defendant's conduct constituted flight; (2) the defendant's flight was the result of

consciousness of guilt; (3) the defendant's guilt related to the crime with which he was charged; and (4) the defendant felt guilty about the crime charged because he, in fact, committed the crime. *Martinez*, 190 F.3d at 678; *United States v. Murphy*, 996 F.2d 94, 97 (5th Cir. 1993).

Because of the inherent unreliability of evidence of flight, and the danger of prejudice its use may entail, a flight instruction is improper unless the evidence is sufficient to furnish reasonable support for all four of the necessary inferences. *United States v. Myers*, 550 F.2d 1036, 1050 (5th Cir. 1977). The *Myers* court found reversible error where the district court gave the same flight instruction proposed by the government in this case because the evidence was insufficient to support all four required inferences. *Id.* at 1049-51.

### C.    Argument

#### 1.    The evidence here fails to support the second and fourth required inferences

The government's evidence did not support the second and fourth inferences necessary to justify a flight instruction. The second inference requires that Mitchell's flight resulted from consciousness of guilt. *Martinez*, 190 F.3d at 678. But Mitchell told Deputy Sams immediately after his arrest that he ran because he was scared. ROA.495 (Deputy

Sams testifying Mitchell stated "he ran because he was scared"); This statement directly contradicts any inference that Mitchell's conduct stemmed from consciousness of guilt about possessing a firearm. Instead, it provides an innocent explanation for his behavior—fear of law enforcement officers who suddenly appeared in a dark storage facility late at night.

In *Myers,* this Court recognized that flight instructions require careful scrutiny of the defendant's mental state. 550 F.2d at 1050. Here, Mitchell's own words—captured in Deputy Sams' arrest affidavit and testimony—undermine the very inference the flight instruction asked the jury to draw. The circumstances of Mitchell's encounter with law enforcement support his explanation. The deputies responded to a burglary call at a storage facility with no lighting. ROA.333, 370, 489. The deputies did not have their emergency sirens or lights activated when they arrived and encountered Mitchell in the dark. ROA.333. When deputies identified themselves, Mitchell was riding the bicycle away from the row of storage units where Carmon Pehl lived. ROA.334, 365, 375. The entire encounter from initial contact to custody lasted less than one minute. ROA.344-45. A Black man suddenly confronted by multiple

44

white officers in a dark, isolated area at night might reasonably experience fear rather than consciousness of guilt. ROA.536 (defense closing argument addressing obvious reasons for fear).

Moreover, Mitchell's recorded jail call to his girlfriend provides additional evidence contradicting consciousness of guilt. In that call, Mitchell told Josephine Little that he was "helping a person" "unlock the damn thing and got charged." Government Exhibit 6. This statement suggests Mitchell believed he was engaged in innocent conduct—helping Carmon Pehl access her storage unit. It does not reflect consciousness of guilt about possessing a firearm, particularly when the firearm was concealed in a bag attached to the bicycle.

The fourth required inference—that Mitchell felt guilty because he actually committed the crime charged—presents an even more fundamental problem. To find this inference supported, the district court would have had to determine that Mitchell actually possessed the firearm with knowledge before instructing the jury on that very question. This impermissibly usurps the jury's role as factfinder.

The Supreme Court recently reaffirmed in *Erlinger v. United States*, 602 U.S. 821, 842 (2024), that in our system of justice, the jury

45

alone determines guilt beyond a reasonable doubt. *Id.* at 842. The Court emphasized that "a criminal defendant enjoys the right to hold the government to the burden of proving its case beyond a reasonable doubt to a unanimous jury of his peers regardless of how overwhelming the evidence may seem to a judge." *Id.* By instructing the jury that they could infer Mitchell's guilt from his flight, the district court necessarily found—before the jury deliberated—that Mitchell felt guilty because he actually committed the crime. This finding invaded the province of the jury.

> 2.    The *Myers* instruction that the government proposed has already been found to create reversible error

The flight instruction issue in this case is particularly troubling because a substantially similar instruction has already caused reversible error in the Fifth Circuit. In *Myers*, the government proposed the following instruction:

> The intentional flight of a defendant immediately after the commission of a crime or after he is accused of a crime that has been committed is not, sufficient evidence in itself to establish his guilty, but is a fact which, if proved, may be considered by the jury in light of all other evidence in the case in determining the guilty or innocent, whether or not evidence of flight shows a consciousness of guilty and the significance to be attached to any such evidence are matters exclusively within the province of the jury.

46

550 F.2d at 1048 n.19. The government's proposed instruction in this case is virtually identical. ROA.177. The *Myers* Court held that giving this instruction was reversible error because the evidence was insufficient to support the four required inferences. 550 F.2d at 1049-51.

The district court attempted to cure the defects in the government's instruction by adding cautionary language from *Williams* about considering innocent reasons for flight. ROA.442-43, 553. But the additional language cannot remedy the fundamental problem: the evidence does not support the necessary inferences. As *Myers* makes clear, the question is not the wording of the instruction but whether the evidence furnishes reasonable support for all four inferences. 550 F.2d at 1050.

> The instruction given to the jury stated:

> The intentional flight of the defendant immediately after the commission of a crime or after he's accused of a crime that has been committed, is not sufficient evidence in itself to establish his guilt, but is a fact which, if proved, may be considered by the jury in light of all other evidence in the case in determining whether guilt—determining guilt or innocence. Whether evidence of flight shows a conscientious—a consciousness of guilt and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

47

> In considering any evidence of flight, if you find there was any flight, you should also consider there may—there may be reasons for flight that are fully consistent with innocence and the jury should consider the motive which prompted it.

ROA.553.

While this instruction included additional cautionary language, it still directed the jury to draw inferences unsupported by the evidence. The instruction told jurors they could consider Mitchell's flight in determining his guilt or innocence when the evidence showed he fled because he was scared, not because he felt guilty about possessing a firearm.

### 3.    The danger of unfair prejudice substantially outweighed any probative value

The flight instruction here carried an especially high risk of unfair prejudice. The jury's own actions demonstrate that this was a close case where the flight instruction likely proved decisive. The jury deliberated for more than two hours before sending a note asking what they should do if they could not reach a unanimous verdict. ROA.554. This indicated a deeply divided jury struggling with the sufficiency of the government's evidence. The jury ultimately returned a guilty verdict approximately two hours and forty minutes after indicating deadlock. ROA.215, 556.

48

What changed during those additional hours? The jury had all the evidence. They had heard all the testimony. The only tool they had to break their impasse was the court's instruction that they could infer guilt from Mitchell's flight—the very inference the evidence did not support.

In a case where the evidence of Mitchell's knowing possession was already weak—where his DNA was excluded from the firearm, where no fingerprints connected him to the weapon, where the gun was found in a bag that could have belonged to Carmon Pehl—the flight instruction likely tipped the scales. The instruction invited jurors to infer guilt from conduct that Mitchell explained as fear, and it did so in circumstances where the government had failed to prove the essential element of knowledge beyond a reasonable doubt. For jurors struggling to reconcile reasonable doubt with their suspicions, the flight instruction provided a way out: if he ran, he must be guilty of something.

The Fifth Circuit has long recognized that flight evidence carries inherent unreliability and danger of prejudice. *Myers*, 550 F.2d at 1050. When a jury is deadlocked and the evidence is closely balanced, an improper flight instruction can be the decisive factor pushing jurors toward conviction. That is precisely what the government conceded in

49

*Myers*: that if the district court erred in making any one of three challenged rulings, the error could not be viewed as harmless because the evidence was so evenly balanced. *Id.* at 1051. The same is true here—with the added dimension that we know exactly when the jury was deadlocked and approximately when they returned a guilty verdict after the court refused to declare a mistrial.

For these reasons, the district court abused its discretion by giving the flight instruction. The evidence was insufficient to support the second and fourth *Myers* inferences, Mitchell's contemporaneous statement provided an innocent explanation for his conduct, and the timing of his flight related to a burglary investigation rather than consciousness of guilt about firearm possession. This Court should reverse Mitchell's conviction and remand for a new trial without the improper flight instruction.

## IV. The trial evidence was insufficient and failed to establish that Mitchell knowingly possessed the firearm concealed in the bag

### A.   Standard of review

Mitchell moved for a judgment of acquittal below. ROA.482-86. This Court reviews a judgment denying a motion for acquittal *de novo*, "but 'with substantial deference to the jury verdict.'" *United States v.*

50

*Lamartiniere*, 100 F.4th 625, 651 (5th Cir. 2024) (quoting *United States v. Delgado*, 672 F.3d 320, 330-31 (5th Cir. 2012) (en banc)), *cert. denied*, 145 S. Ct. 1069 (2025). "Under this standard, [this Court] will uphold a jury's verdict as long as 'a reasonable trier of fact could conclude [that] the elements of the offense were established beyond a reasonable doubt.'" *Id.* (alteration in original) (citation omitted). This Court views "the evidence in the light most favorable to the verdict and draw[s] all reasonable inferences from the evidence to support the verdict." *Id.* (quoting *United States v. Jimenez-Elvirez*, 862 F.3d 527, 533 (5th Cir. 2017) (citation omitted)).

## B.    Applicable law

To support a conviction under 18 U.S.C. § 922(g)(1), the government must prove (1) that Mitchell knowingly possessed a firearm as charged, (2) that before Mitchell possessed the firearm, he had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, (3) that he knew he had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, and (4) that the firearm possessed traveled in interstate or foreign commerce. *Fifth Circuit Pattern Jury Instructions (Criminal Cases)* 2.43D (2024).

Only the first element—possession—is relevant here. Possession under § 922(g)(1) may be actual or constructive and may be proved by circumstantial evidence. *United States v. Fields*, 977 F.3d 358, 379 (5th Cir. 2020). Actual possession occurs when a defendant knowingly has direct physical control over a thing at a given time. *Id.* (citing *United States v. Munoz*, 150 F.3d 401, 416 (5th Cir. 1998)). Mere touching or physical contact alone is insufficient by itself to establish possession. *United States v. Smith*, 997 F.3d 215, 221 (5th Cir. 2021). A defendant must be "master of" the item or exercise sufficient control to render him the owner of the thing. *Id.* at 221-22.

Constructive possession is ownership, dominion or control over a thing, or control over the premises where the thing is found. *Fields*, 977 F.3d at 379. Constructive possession may be found if the defendant had (1) ownership, dominion or control over the item itself or (2) dominion or control over the premises in which the item is found. *Meza*, 701 F.3d at 419. The determination of whether constructive possession exists is not a scientific inquiry. Courts must employ a common sense, fact-specific approach. *United States v. Wright*, 24 F.3d 732, 735 (5th Cir. 1994) (citing *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993)).

Critically, the government must prove more than mere proximity to contraband. When contraband is found in a location accessible to multiple people, the government must present evidence supporting at least a plausible inference that the defendant had knowledge of and access to the illegal item. *United States v. Hinojosa*, 349 F.3d 200, 204 (5th Cir. 2003). The evidence must support an inference that the defendant exercised control over the item. *Meza*, 701 F.3d at 419.

## C.   Argument

Even viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in support of the verdict, no rational trier of fact could conclude beyond a reasonable doubt that Mitchell knowingly possessed the firearm found in the bag attached to the bicycle. The government's case suffers from fatal evidentiary gaps that prevent any reasonable inference of knowing possession.

### 1.   The government presented no evidence linking Mitchell to the firearm

The government proceeded on a constructive possession theory. But the government presented no evidence that Mitchell owned the bag, that he knew what was inside the bag, or that he had any connection to the firearm whatsoever. The entirety of the government's case rests on this

syllogism: a firearm was found in a bag; the bag was attached to bicycle Mitchell was seen riding; therefore, Mitchell possessed the firearm. This reasoning fails as a matter of law because it conflates possession of a bicycle with knowledge of concealed contraband attached to that bicycle.

The gun was located inside of an opaque brown bag. ROA.358. No witness testified that Mitchell placed the firearm in the bag. No witness testified that Mitchell accessed the contents of the bag. No witness testified that Mitchell knew the firearm was present. The government presented no evidence of Mitchell's fingerprints on the firearm, the bag, or any ammunition. ROA.497 (Deputy Sams testifying no fingerprint analysis was requested on gun or handbag). The government presented no evidence that Mitchell owned the bag or that any personal effects belonging to him were found inside. ROA.497 (Deputy Sams testifying no identification was found in the handbag).

This Court has held that mere proximity to contraband is insufficient to establish possession. *See Smith*, 997 F.3d at 220 (even touching a firearm by itself is not enough to establish knowing possession). In *Hinojosa*, this Court explained that when contraband is found in a location accessible to multiple people, the government must

54

present evidence supporting at least a plausible inference that the defendant had knowledge of and access to the illegal item. 349 F.3d at 204. Here, the evidence shows only that a bag containing a firearm was attached to the bicycle Mitchell was riding. That proves he had proximity to the bag—it does not prove he knew what was inside.

The government attempted to bridge this evidentiary gap by arguing to the jury that Mitchell must have known about the firearm because it was attached to the bicycle. But this inference is unreasonable. The bag was not transparent. The firearm was concealed inside. Without evidence that Mitchell placed the gun there, accessed the bag's contents, or had any interaction with the firearm, no rational juror could infer knowledge from mere attachment to the bicycle's handlebars.

### 2. The forensic evidence affirmatively excludes Mitchell as the source of DNA on the firearm

The government's case is further undermined by the only forensic evidence introduced at trial. The DNA evidence does not merely fail to connect Mitchell to the firearm—it affirmatively excludes him and points to an unidentified third party. The government swabbed the firearm for DNA and obtained a partial DNA profile. ROA.469. Kari Dicken, a forensic DNA analyst, compared that profile to Mitchell's DNA sample.

ROA.458, 469. She testified unequivocally that the partial DNA profile from the firearm was inconsistent with the reference sample from Maurice Mitchell and that Mitchell "is excluded as a contributor to the DNA profile collected from the swabs from the firearm." ROA.469.

On cross-examination, defense counsel confirmed the meaning of this exclusion:

> Q. That means he's not the person whose DNA is on the swab?
> A. Correct.
> Q. So that's someone else's DNA?
> A. Correct.

ROA.477.

This is not a case of absent evidence or inconclusive results. The forensic evidence obtained from the firearm excludes Maurice Mitchell and identifies an unknown person who handled that weapon. The government presented no fingerprint evidence connecting Mitchell to the firearm. The only physical evidence linking anyone to that weapon excludes Mitchell and points to an unidentified third party.

The government suggested this exclusion is meaningless because it is possible to handle a firearm without leaving DNA. ROA.463-64 (Ms. Dicken testifying it is possible to handle firearm but not leave DNA). But

the government misapprehends its burden. The question is not whether it is theoretically possible that Mitchell touched the gun without leaving a trace. The question is whether the evidence permits a rational juror to find beyond a reasonable doubt that Mitchell knowingly possessed the firearm when the only forensic evidence excludes him as the person who handled it.

When DNA evidence is obtained from a firearm and that evidence excludes the defendant while including an unknown third party, a rational juror cannot ignore that evidence and convict based solely on proximity. *See Smith*, 997 F.3d at 220 (noting significance of lack of forensic evidence connecting defendant to firearm in actual possession analysis). The DNA evidence here does not merely fail to inculpate Mitchell—it affirmatively exculpates him.

### 3. No rational juror could exclude the reasonable hypothesis that the bag belonged to Carmon Pehl

The evidence presented at trial supports a more plausible hypothesis that the bag and firearm belonged to Carmon Pehl, not Mitchell. Gary Underwood, the owner of Arrowhead Mini Storage, testified that he commonly saw Carmon Pehl at the storage facility and that she would often arrive on a bicycle. ROA.375. He testified that he

believed Pehl was actually living in storage unit I-18. ROA.375. Underwood testified that several days after her arrest and officers left the bicycle in the ditch, Pehl returned to the storage facility riding her bike. ROA.376.

Officer Hurd testified that when deputies arrived at the storage facility, they observed Mitchell riding a bicycle and Carmon Pehl walking, both coming from the same row of storage units. ROA.334. The aerial photograph and testimony established that they were exiting from the area where unit I-18—Pehl's unit—was located. ROA.534 (defense closing noting Mitchell and Pehl were exiting from the road where Pehl was living). Yet Pehl, who was known to ride a bicycle at the storage facility, was not a bike and her companion was.

The bag was described as a brown satchel with a shoulder strap. ROA.344-45, 344. Officer Hurd testified that the strap was wrapped around the handlebars of the bicycle. ROA.344-45. Nothing about the bag or its attachment suggests it was Mitchell's property rather than something he was carrying for his companion.

Critically, the government never investigated whether the bag or firearm belonged to Carmon Pehl. Deputies never tested Pehl's DNA

58

against the firearm. ROA.533. They never interviewed her to ask about the bag or its contents. ROA.532. They never attempted to determine ownership of the bag. Deputy Sams testified that the bag contained no identification. ROA.497. Yet rather than investigate further, deputies simply assumed the bag belonged to Mitchell because it was attached to the bicycle he was riding.

This failure to investigate is fatal to the government's case. A woman living alone in a storage unit would have obvious reasons to possess a firearm for self-protection. The evidence that Pehl frequently traveled to the storage facility by bicycle, that she was present with Mitchell when deputies arrived, and that both were coming from the area where she lived, supports the reasonable inference that the bicycle, bag, and its contents belonged to her.

Ms. Pehl was arrested that night for drug possession. ROA.338-39. The government never explained why, if deputies suspected Mitchell of possessing a firearm, they did not similarly suspect Pehl. The DNA on the firearm belonged to someone—and that someone was not Mitchell. The government's failure to test whether that DNA belonged to Pehl leaves a gaping hole in its case.

### 4. Mitchell's contemporaneous statements contradict knowing possession

Mitchell's own statements undermine any inference that he knowingly possessed a firearm. Immediately after his arrest, Mitchell told Deputy Sams that he ran because he was scared. ROA.495. In a recorded jail call played for the jury, Mitchell told his girlfriend Josephine Little that he was "helping a person" "unlock the damn thing and got charged." Government Exhibit 6.

These statements are inconsistent with consciousness of guilt about possessing a concealed firearm. A person who believes he is helping someone unlock a storage unit and who subsequently learns he has been arrested has no reason to connect that arrest to a firearm hidden inside a bag on the bicycle—a firearm he did not know existed.

The government relies on Mitchell's flight as evidence of guilt. But Mitchell provided an innocent explanation for his flight: fear. His statement to Deputy Sams that he was scared is consistent with the circumstances. Three uniformed deputies in marked vehicles arrived at a dark, isolated storage facility late at night. ROA.489, 491. When they identified themselves, Mitchell attempted to leave. ROA.340. The entire encounter from initial contact to custody lasted less than one minute.

ROA.344-45. A rational juror could conclude that Mitchell—a Black man confronted by multiple white officers in a desolate area at night—fled out of fear rather than consciousness of guilt about a firearm he did not know was in the bag on the bicycle.

### 5.    The government's incomplete investigation left critical questions unanswered

The government's investigation was so deficient that it failed to establish even basic facts necessary to prove possession. Deputy Sams, the primary officer, took no photographs of the bicycle, the bag, or the scene. ROA.498. He did not seize the bicycle as evidence. ROA.496. He did not seize the bag as evidence.496-97. At trial he could not say where either item was presently located. ROA.496-97

Deputy Sams and Officer Hurd handled the evidence without wearing gloves—or at least, Hurd could not recall whether he wore gloves. ROA.359. Yet neither officer provided an elimination DNA sample to exclude their own DNA from the firearm. ROA.477-78. The crime lab was never informed that officers had handled the gun without gloves. ROA.478.

Deputies never contacted Megan Mazur, the person who reported the burglary. ROA.360-61, 499. They never followed up on that

investigation. ROA.360-61. They never contacted Gary Underwood, the storage facility owner, to inform him of the incident. ROA.374. They found no signs of any break-in at the storage facility. ROA.360-61.

These investigative failures are not mere technicalities. They represent a wholesale failure to gather evidence necessary to prove the essential element of the charged offense. When the government fails to photograph the bag, fails to preserve it as evidence, fails to test the DNA of the only other person present, and fails to conduct even a basic investigation into ownership, it cannot meet its burden of proving knowing possession beyond a reasonable doubt.

### 6. The cumulative weight of these deficiencies renders the evidence insufficient

The government's case collapses under the weight of what it failed to prove and what it failed to investigate. Consider what a rational juror would need to find to convict Mitchell beyond a reasonable doubt:

*First*, the juror must find that Mitchell knew the firearm was in the bag—despite no evidence he owned the bag, accessed its contents, or had any awareness of what was inside the opaque satchel.

*Second*, the juror must disregard the DNA evidence that affirmatively excludes Mitchell and identifies an unknown person who handled the weapon.

*Third*, the juror must reject the reasonable hypothesis that the bag belonged to Carmon Pehl, who lived at the storage facility, who routinely arrived there by bicycle, who was walking alongside Mitchell, and who was never investigated as a suspect.

*Fourth*, the juror must interpret Mitchell's flight as consciousness of guilt about a concealed firearm rather than fear of police—an interpretation directly contradicted by Mitchell's own statement that he was scared and his explanation that he was helping someone unlock a storage unit.

*Fifth*, the juror must overlook the government's wholesale failure to conduct even basic investigative steps: no photographs of the scene, no preservation of the bag or bicycle as evidence, no DNA testing of the other person present, no fingerprint analysis, no follow-up with the burglary complainant, no investigation into ownership of the bag.

Each of these required findings rests not on evidence but on speculation. Taken together, they demonstrate that no rational trier of fact could find knowing possession beyond a reasonable doubt.

The government asks this Court to sustain a conviction based entirely on the fact that a bag containing a firearm was attached to the bicycle Mitchell was seen riding. But that single fact, standing alone, proves only proximity—not knowledge, not dominion, not control.

Without evidence that Mitchell owned the bag, knew what was inside, or had any connection to the firearm, the jury was left to speculate. The law does not permit convictions based on speculation. When the only forensic evidence excludes the defendant, when an equally plausible alternative suspect exists, when the defendant's statements contradict guilty knowledge, and when the government's investigation leaves basic questions unanswered, the evidence is insufficient as a matter of law.

The jury's difficulty reaching a verdict confirms this insufficiency. After more than two hours of deliberation, the jury sent a note asking what to do if they could not reach a unanimous verdict. ROA.554. They deliberated for another two hours and forty minutes before returning a

64

guilty verdict. ROA.215, 556. This near-deadlock demonstrates that even after viewing the evidence favorably to the government, rational jurors recognized the gaping holes in the prosecution's case. That some jurors ultimately voted to convict after extended deliberation and a deadlock does not cure the fundamental insufficiency—it underscores it.

This Court should reverse Mitchell's conviction and remand with instructions to enter a judgment of acquittal on the ground that no rational trier of fact could find that Mitchell knowingly possessed the firearm charged in the indictment.

## CONCLUSION

For the foregoing reasons, Appellant Maurice Mitchell respectfully requests that the Court reverse his conviction and remand for a new trial, or alternatively, reverse his conviction and remand with instructions to enter a judgment of acquittal or dismissal of the indictment.

Respectfully submitted,

CRISTIE GAUTREAUX GIBBENS
Interim Federal Public Defender

BY:   *s/ Dustin C. Talbot*
       DUSTIN C. TALBOT
       Appellate Chief
       Federal Public Defender's Office
       Middle and Western Districts of Louisiana
       102 Versailles Boulevard, Suite 816
       Lafayette, Louisiana 70501
       Telephone: (337) 262-6336

       *Attorney for the Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this day been served by the 5th Circuit electronic filing system on the Assistant United States Attorney, on January 7, 2026.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,729 words.

2.  This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century typeface with a 14 point font.

Lafayette, Louisiana, January 7, 2026.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

67